**Daryle D. JAMES, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7690.

Court of Appeals of Alaska.

June 28, 2002.

Dan S. Bair, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A jury convicted Daryle D. James of second-degree sexual abuse of a minor[1] and second-degree sexual assault.[2] On direct appeal, we affirmed James's convictions and sentence.[3] James filed an application for post-conviction relief, and James now appeals

1. AS 11.41.436(a)(1).

2. AS 11.41.420(a)(3)(B).

3. *See James v. State*, Memorandum Opinion and Judgment No. 3734 at 29, 1997 WL 796507 (Alaska App., December 24, 1997).

the superior court's dismissal of his application.

James argues that the superior court erred when it dismissed his claim that he was entitled to a new trial because the only eyewitness to his sexual misconduct recanted. But the superior court held a hearing on this claim at which the recanting witness testified. The court made findings on the testimony presented and denied James's claim. We affirm the superior court because its findings rejecting this claim are not clearly erroneous.

James also argues that the superior court erred when it dismissed his remaining claims before his attorney gave a detailed explanation of why those claims lacked merit.[4] Because of the unusual factual circumstances in James's case, we agree with James for the reasons stated below. Accordingly, we vacate the dismissal of those remaining claims and remand for further proceedings.

*Discussion*

*The recanting witness claim*

The underlying criminal case arose on June 12, 1994. Following a dance in Ketchikan, a group of teenagers gathered in a Saxman home for a late night party. Several adults were also drinking at the house. While at the party, thirteen-year-old E.F. became intoxicated, eventually passed out, and has no recollection of the early morning hours of June 12.

At some point in the night, E.F. had sex with M.C. D.M., a fourteen-year-old girl at the party, testified that after M.C. and E.F. had sex, she dressed E.F. and covered her up with a sleeping bag. Later, D.M. checked on E.F. and again found her naked. James came into the room while D.M. was there and commented on E.F.'s vaginal area. D.M. dressed E.F. and left. When D.M. checked

4. *See Griffin v. State*, 18 P.3d 71, 77 (Alaska App.2001) ("[T]he attorney seeking to withdraw from the case must provide the court with a full explanation of all the claims the attorney has considered and why the attorney has concluded that these claims are frivolous.").

on E.F. again, another man was having sex with E.F.

Later that morning, James complained because E.F. was in his room, and she was dragged to another bedroom. D.M. opened the door to this room and observed James engaged in sexual intercourse with E.F., who was unconscious. After she saw him having sex with E.F., D.M. started to yell at James. D.M. was the only eyewitness to James's sexual assault of E.F. James is D.M.'s great uncle.

Bert Colegrove, one of the adults at the house, told police shortly after the incident that he saw James dragging an unconscious naked teenage girl from one room to another. Colegrove said that he told James not to do that, and James told him to mind his own business. Colegrove recanted at the grand jury and testified that he thought James was just trying to get E.F. to a "safe place."

Colegrove's son also saw James and M.C. drag E.F. to a room and shut the door. When Colegrove's son returned to the room, he saw fresh semen on the mattress.

A number of individuals who claimed to have been at the party testified in support of James at his trial. According to these witnesses, James asked some of the teenage boys who were upstairs to "get this fucking bitch" out of his room because he wanted to go to sleep and E.F. had gotten sick in his bedroom. Most of the defense witnesses testified that three boys dragged E.F. from James's bedroom to another bedroom and that E.F. was clothed. None of the witnesses corroborated D.M.'s testimony that she began yelling at James when she saw James having sex with E.F.

At approximately 5:00 a.m., Burt Colegrove and his family left the house and took a cab to downtown Ketchikan. Colegrove called the troopers because he was concerned about E.F. and because he had seen teenagers drinking at the party.

Alaska State Trooper Sergeant Robert Stevenson responded to the party and spoke to D.M. and E.F. That afternoon, E.F. went to Ketchikan General Hospital for a sexual assault exam. The troopers performed DNA tests on evidence collected during the examination and on blood samples from James. The DNA testing showed that James's DQ-alpha genotype did not exclude him as the source of the semen and that approximately 58% of the Tlingit population have this DQ-alpha genotype (James is Tlingit).

Sergeant Jeffrey Hall contacted D.M. on June 16, 1994, four days after the incident. D.M. was reluctant to talk to Sergeant Hall, but Hall did not remember pressuring or threatening her to get her to talk. During this initial interview, D.M. cried and said it was difficult for her to talk about the incident because James was family. She said that she saw James having sex with E.F. and that E.F. was passed out.

On June 23, 1994, Sergeant Hall arrested James and charged him with first-degree sexual abuse of a minor and second-degree sexual assault. On July 1, 1994, a grand jury indicted James on charges of second-degree sexual abuse of a minor and second-degree sexual assault. The troopers were unable to find D.M. to serve her with a subpoena to appear at the grand jury proceedings. D.M. and her mother moved to Anchorage in July 1994. On June 6, 1994, before the assault, D.M. had been adjudicated a delinquent based on two counts of fourth-degree assault. She was a runaway probationer because she left Saxman without notice.

James's trial was scheduled for October 11, 1994. The State requested several continuances because the State was unable to locate D.M. On December 20, 1994, the court granted the State's request to issue a material witness warrant for D.M.

On December 29, 1994, authorities arrested D.M. on the material witness warrant. She was held at McLaughlin Youth Center and at Johnson Youth Center for several weeks while awaiting trial. James went to trial on February 21, 1995. At trial, D.M. testified that there was no doubt in her mind that she saw James having sex with E.F.

In her affidavit recanting her trial testimony, D.M. stated: "I am making these statements because I want to tell the truth, and I want the people who hurt and abused me to answer for what they did." D.M. claimed in her affidavit:

I remember when they started questioning me. They did it on the phone. At first I told them "I can't tell you nothin' because I can't remember." I had been drinking. I didn't say that because I didn't want to get in trouble. They kept asking me about [James]. By they I mean the D.A. and the troopers.

She alleged that at Johnson Youth Center in Juneau the district attorney and the troopers told her that she would not get out of jail until she was twenty-one if she did not testify. She also stated:

I told my attorney that I did see stuff at the party, because I knew I needed to do it to get out of J.Y.C. When I knew what they wanted me to say, and I said those things they wanted to hear and my attorney was real concerned about people trying to get me to say things. I didn't even think about my uncle doing time. I was just thinking about me and how I hated it where I was. I was abused physically and emotionally. My sister needed me and I wanted out of JYC really bad. I didn't think about my uncle, that's why I cried on the witness stand.... I practiced my testimony in my cell.

D.M. also claims she was mistreated by the guards and that they misunderstood her case, but she does not explain if the mistreatment was related to them trying to get her to testify against James.

Before testifying at trial, D.M. met with Janice Hill, a paralegal from the District Attorney's office; Ben Herren, the Assistant District Attorney prosecuting the case; Debbie Muir, the trooper who transported D.M. from Juneau to Ketchikan; and Sergeant Hall. At the evidentiary hearing, Hall, Herren, and Muir testified that no one pressured or threatened D.M. to testify consistent with what she had told Sergeant Hall initially.

Sergeant Hall also testified that he did not contact D.M. while she was at McLaughlin or the Johnson Youth Center. He testified that the State did not bribe D.M. During the meeting before D.M. testified at trial, Sergeant Hall reviewed his prior interview with her, and she told him her testimony would be consistent with the prior interview.

Assistant District Attorney Herren testified that he did not discuss perjury with D.M. and that he did not remember calling D.M. while she was at the youth centers or instructing anyone in his office to contact her. He testified that he was surprised that her trial testimony did not waver because of the difficulty securing her attendance at trial.

Superior Court Judge Michael A. Thompson concluded that the determining factor in the case was that no one was pressuring D.M. when she talked to Sergeant Hall initially about seeing James having sexual intercourse with E.F. He found that after D.M. became the State's "star witness" there was pressure on her not to change her story. Judge Thompson believed that guards and other inmates at McLaughlin put "considerable pressure" on D.M. by telling her that if she changed her story, that it would be perjury, and that is a crime for which she could be committed. But he also found that D.M.'s family pressured her to recant. And the judge recognized that at the time of trial, D.M. had "possibilities of manipulating her position into positives for her" but when she recanted, she had nothing to gain from the State.

Judge Thompson recognized that James had the burden of proving by clear and convincing evidence that D.M. lied at the trial and was telling the truth when she testified at the evidentiary hearing. The judge examined D.M.'s motives at the time she gave her initial statement to the troopers, her motives at the time of trial, and her motives when she recanted. Judge Thompson found that D.M.'s recantation testimony was not credible.

A review of the record on this issue establishes that Judge Thompson's findings are not clearly erroneous.[5] Accordingly, Judge Thompson did not abuse his discretion when he found that D.M.'s recantation was insufficient to hold a new trial.[6]

---

**5.** See *Tucker v. State,* 892 P.2d 832, 834 (Alaska App.1995).

**6.** See *Hensel v. State,* 604 P.2d 222, 235 & n. 55 (Alaska 1979); *Brown v. State,* 803 P.2d 887, 888 (Alaska App.1990).

*James's remaining claims*

On September 26, 1997, James filed a pro se application for post-conviction relief. James claimed that (1) he was denied a grand jury of his peers; (2) he was denied a jury of his peers; (3) the jury composition was illegal because more than one-half of the judicial district was excluded as potential jurors; (4) his right to a fair trial was violated under article one, sections seven, eight, and nine of the Alaska Constitution; (5) he suffered ineffective assistance of trial counsel; (6) he suffered ineffective assistance of sentencing counsel; and (7) he suffered ineffective assistance of appellate counsel. James filed a pro se Memorandum of Facts and Authorities that addressed only his claims regarding the selection and composition of the jury.

In January 1998, the court appointed the Public Defender Agency to represent James, but the court allowed the agency to withdraw because it represented D.M., the recanting witness in James's case. The State filed a Motion to Dismiss James's application on January 28, 1998. The court appointed the Office of Public Advocacy as counsel for James, and on February 10, 1998, Ronald Hemby entered an appearance on James's behalf. Thereafter, on March 16, 1998, Judge Thompson dismissed James's application.

On behalf of James, Hemby moved for reconsideration of the dismissal and asked to supplement James's post-conviction relief application, because the pro se application "omitted issues that should be considered" and because of newly discovered evidence "in the form of recantation of testimony by the only alleged eyewitness to the offense[.]" Hemby sought additional time to review the case and explore the claims regarding the grand jury procedure and ineffective assistance of counsel. Judge Thompson granted James's motion. Later, Hemby filed a "Memorandum in Supplement of Petition for Post Conviction Relief." Although the memorandum stated it incorporated James's pro se application, it discussed only the recantation claim and requested an evidentiary hearing to resolve the claim. The State opposed the recantation claim and requested an evidentiary hearing to resolve the recanting witness claim.

On June 16 and 19, 1998, Judge Thompson held an evidentiary hearing. At the conclusion of the hearing, the State brought up the other issues contained in James's post-conviction relief application:

> Finally, there were two other issues that were raised in Mr. James's application for post-conviction relief dealing with jury selection, and the other one ineffective assistance of counsel. And I filed a motion for summary adjudication, which the court granted, and ... the defense asked to reconsider it. And the court granted him some time to do so. And when they filed their motion, all they raised was the issue of recantation. They didn't raise any other issue. And so the state feels the court should grant summary adjudication on those other two issues as well.

James's counsel did not respond to this argument. Judge Thompson stated:

> The only reason I granted reconsideration, Mr. Hemby, on those was there was a change of counsel. I wanted new counsel to take a new look. You know, and maybe you'd come up with a case or some principle or argument that hadn't been made before. I see you didn't. I wasn't surprised you didn't. I think the arguments were well stated beforehand. They were brought as forcefully as they could be brought, and they simply weren't persuasive. Once again, I was here at the trial and I thought the jury selection was fair.

Even though the court did not explicitly dismiss James's remaining claims, on July 13, 1998, James moved (through Hemby's partner, Vernon Keller) to supplement his post-conviction relief application. In the affidavit supporting the motion, James's attorney stated that the firm's efforts had focused on the recantation issue:

> The Memorandum in Supplement of Petition for Post–Conviction Relief did not supplement any of the issues previously raised by Mr. James in his original Application.... Mr. James has claimed that he was provided ineffective assistance of counsel by his trial attorney ... and his

sentencing and appellate attorney.... Mr. James needs additional time to get affidavits from these attorneys so that his allegations of ineffective assistance of counsel can be meaningfully evaluated by his current counsel and addressed by this court.

The State did not oppose the request, and on August 11, 1998, the court granted James's motion to supplement his petition. However, less than a week later, another attorney, Brian Schulz, substituted for Hemby's firm. The notice of substitution claimed that Hemby had a conflict of interest, but the court never ruled on this issue.

On December 22, 1999, Schultz filed a Certificate of No Merit under Criminal Rule 35.1(e)(2)(B). The court issued a "Proposed Withdrawal and Dismissal" on February 9, 2000. Judge Thompson granted James additional time to respond to the proposed order, but dismissed James's application on May 2, 2000.

The State argues that Schulz's Rule 35.1(e)(2)(B) no-merit certificate has no legal significance. The State contends that since James's *initial* attorney did not select the option of filing a no-merit certificate, and instead, pursued the recantation claim to a hearing, the *Griffin* requirement need not be met for the remaining claims.

Normally, a competent attorney can analyze the potential claims raised in an application for post-conviction relief and, as a matter of sound tactical consideration, decide which claims to pursue.[7] But the record in this case does not show this is what occurred. Hemby elected to present the recantation claim to the court, but shortly after the court rejected that claim at the hearing, his firm asked for more time to meaningfully evaluate the claims James raised pro se. Thus, one lawyer or firm did not evaluate all the potential claims and conclude that only the recantation claim had merit.

As we pointed out in *Griffin:*

[A]n indigent petitioner for post-conviction relief has a right to the effective assistance of counsel, and thus the court has a duty to independently assess the potential merits of the petitioner's case whenever the petitioner's court-appointed attorney declares that the litigation is frivolous and asks permission to withdraw. Rule 35.1(f)(2) in fact requires the trial court to perform this independent assessment. But if the attorney is permitted to file a certificate containing only the four bare assertions listed in Rule 35.1(e)(2)(B)(i)-(iv) ..., it will be impossible for the trial court to perform the independent assessment required by Rule 35.1(f)(2).[8]

Although Hemby focused on the recantation claim that led to the evidentiary hearing, after the court rejected that claim, Hemby's firm requested additional time to evaluate the other claims in the application and "to get affidavits from [the trial] attorneys so that his allegations of ineffective assistance of counsel can be meaningfully evaluated by his current counsel and addressed by this court." The State did not oppose the request for more time and the superior court found good cause to grant James's attorney additional time to evaluate those remaining claims by obtaining affidavits from James's trial attorneys. (An affidavit from the trial attorney is a necessary component of a prima facie case of ineffective assistance of counsel.[9]) Although Bryan Schultz substituted for Hemby's firm and filed a certificate that followed the provisions of Rule 35.1(e)(2)(B), the certificate did not provide the court with the analysis we later established in *Griffin:* "[A] full explanation of all the claims the attorney has considered and why the attorney has concluded that these claims are frivolous."[10] The court allowed the attorney to

---

7. See *Jones v. Barnes,* 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983) (decision to forego weaker arguments on appeal is part of effective appellate advocacy; counsel is not required to raise every colorable claim); *Tucker v. State,* 892, P.2d 832, 836–37 (Alaska App.1995); *State v. Jones,* 759 P.2d 558, 570 (Alaska App.1988).

8. *Griffin,* 18 P.3d at 76 (Alaska App.2001).

9. See *Peterson v. State,* 988 P.2d 109, 113–14 (Alaska App.1999).

10. *Griffin,* 18 P.3d at 77.

withdraw even though James still had the right to appointed counsel to appeal the court's denial of the recantation claim.[11]

A fair reading of the attorney's request for more time after the evidentiary hearing is that James's attorney focused on the recanting witness without evaluating the merit of James's remaining claims. As we indicated in *Griffin*, an attorney seeking to withdraw from a case after the attorney has concluded that all of the applicant's claims are meritless must describe all the claims the attorney has analyzed along with an explanation why the attorney has concluded those claims are frivolous.[12] This is required so the trial court can satisfy its duty under Alaska Criminal Rule 35.1(f)(2) to ensure that an applicant received zealous investigation and presentation of any colorable claims.[13]

As the record presently stands in this case, it is apparent that James's attorneys litigated the recantation claim without evaluating the claims James raised pro se. Although the court could have required the parties to be prepared to resolve all the application's claims at the hearing, the court did not do so. And after the court considered and rejected the recantation claim that James's attorney raised, the court found good cause to permit James to pursue the other claims. Thus, James stood in the same position after the hearing that he did before the recantation claim was litigated: his application asserted deficiencies in jury composition and claims of ineffective assistance of counsel.

Ordinarily, a detailed no-merit certificate as required by *Griffin* as a predicate for the court permitting the withdrawal of appointed counsel applies to the limited circumstance where appointed counsel concludes that the application for post-conviction relief presents no colorable claims to litigate. That was not the case here because the recantation claim required a two-day evidentiary hearing and could only be resolved after the court considered the credibility of witnesses. James retained his right to appeal the superior court's rejection of that claim and the right to ap-

pointed counsel for that appeal. Even so, the superior court permitted withdrawal.

When James's attorney filed the no-merit certificate in this case, we had not issued *Griffin* and there was no requirement that the attorney describe the claims the attorney considered along with an analysis of why those claims were frivolous. Thus, the record is not clear what claims James's last post-conviction relief attorney considered to be frivolous. Certainly, James's right to appeal the denial of the recantation claim was not. Consequently, because of the unusual circumstances of this case, we vacate the order of the court dismissing James's remaining claims and remand for further proceedings.

*Conclusion*

The judgment of the superior court is AFFIRMED in part, VACATED in part, and REMANDED for further proceedings. We do not retain jurisdiction.

MANNHEIMER, Judge, concurring.

I agree with my colleagues that, because of the unusual facts of this case, James's last post-conviction relief attorney could not simply notify the superior court of his conclusion that none of James's remaining claims had merit. Rather, the attorney was bound by the rule we announced in *Griffin v. State*, 18 P.3d 71 (Alaska App.2001)—that is, he was obliged to provide the superior court with a full explanation for his conclusion that James had no further colorable issues to raise. I am writing separately to clarify my factual and legal reasons for reaching this conclusion.

In *Griffin*, we augmented the literal wording of Alaska Criminal Rule 35.1(f)(2) to ensure an indigent defendant's right to effective assistance of counsel. We held that when an attorney is appointed to represent an indigent petitioner for post-conviction relief, and when the attorney concludes that

---

**11.** *See* AS 18.85.100(a) & (c); *Grinols v. State*, 10 P.3d 600, 618 (Alaska App.2000).

**12.** *See Griffin*, 18 P.3d at 77.

**13.** *See id.*

the petitioner has no colorable claim for relief, the attorney is obliged to "provide the court with a full explanation of all the claims the attorney has considered and why the attorney has concluded that these claims are frivolous".[1] This explanation is required so that the court can "fulfill its duty to make sure that indigent litigants do in fact receive zealous investigation and presentation of any colorable claims for post-conviction relief".[2]

But what of situations where the attorney concludes that the petitioner has at least one claim that has arguable merit and should be pursued? In such circumstances, does *Griffin* require the attorney to explain why they are not pursuing other potential claims?

The answer is no. *Griffin* applies only when the attorney concludes that there are no colorable claims to be raised on the petitioner's behalf.

In *Tucker v. State*, 892 P.2d 832 (Alaska App.1995), we addressed an analogous issue—an attorney's obligation when representing an indigent defendant on direct appeal. The question in *Tucker* was whether an appellate attorney is obliged to raise every colorable issue that might be raised on appeal or whether, instead, the attorney could choose to pursue the most meritorious issues and abandon claims that, although arguable, stood a lesser chance of success. We held that "[s]uch strategic choices fall squarely within the sphere of competent representation." [3]

In support of this conclusion, we relied on the United States Supreme Court's decision in *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). In *Jones*, the Court recognized that a crucial part of appellate advocacy is to winnow out weaker arguments. Thus, the Court held, an appellate attorney representing an indigent defendant is not required to raise every colorable claim.[4]

We now hold that this same rule applies to attorneys representing indigent defendants in post-conviction relief litigation. Part of the attorney's job is to investigate the case and then select which issues to pursue and which to forego. When the petitioner's attorney reviews the petitioner's potential claims for post-conviction relief and then actively litigates one or more of those claims, the concern that prompted our decision in *Griffin* is alleviated: that is, the court can justifiably presume that the petitioner is receiving zealous representation. Absent a later assertion that the attorney acted incompetently when selecting the claims to litigate, there is no need for the attorney to independently justify all the roads not taken. *Griffin* applies only when the attorney declares that there are no claims to litigate.

At first glance, the present appeal seemingly presents a situation where *Griffin* does not apply. James and his attorneys (the law firm of Hemby and Keller) raised several potential claims between them, but Hemby and Keller selected one claim to actively litigate: the claim involving the witness's recantation. Once this claim was litigated to conclusion, there was apparently nothing more to do (except appeal the superior court's rejection of this claim).

But after the superior court decided the witness recantation claim against their client, Hemby and Keller announced that they had never actively investigated James's other claims. In effect, Hemby and Keller told the court that they had decided to litigate James's petition in piecemeal fashion, but had refrained from telling the court of their intention until the court issued its adverse ruling on the witness recantation claim.

Alaska Criminal Rule 35.1(f)-(g) appears to contemplate that, unless the court allows a different procedure, all of a petitioner's claims will be investigated and pleaded by

1. *Id.*, 18 P.3d at 77.

2. *Id.*

3. *Id.* at 836.

4. *See id.*, 463 U.S. at 751–54, 103 S.Ct. at 3312–15. *See also Briones v. State*, 74 Haw. 442, 848 P.2d 966, 978 (1993) (an attorney's informed decision on which issues to raise on appeal is presumed competent); *Williamson v. State*, 852 P.2d 167, 169 (Okla.Crim.App.1993) ("It is the role of appellate counsel to carefully select and develop the legal issues to be presented to the court[; counsel need] not raise every non-frivolous issue conceivable.").

the time the court schedules a hearing on the petition. In James's case, however, the superior court effectively allowed Hemby and Keller to bifurcate the litigation of James's petition—by giving the lawyers more time to investigate and pursue additional claims after the court had already decided the witness recantation claim.

Shortly after they secured this bifurcation of the litigation, Hemby and Keller moved to withdraw from the case, alleging that they had a newly-arisen conflict of interest. The superior court granted this motion and appointed a new attorney to represent James. It was this new attorney who filed a statement under Criminal Rule 35.1(f)(2), declaring that James had no colorable claims to present.

Under these unusual facts, James never had an attorney (or a law firm) who reviewed all of his potential claims and then selected one or more of them to be actively litigated. Rather, Hemby and Keller (with the tacit approval of the superior court) selected one claim to litigate while, at the same time, they let James's other potential claims go unexamined. After the superior court heard and rejected their one selected claim (the witness recantation claim), Hemby and Keller withdrew from the case and the superior court was obliged to appoint another attorney to investigate James's remaining potential grounds for post-conviction relief.

Under these circumstances, I agree with my colleagues that the *Griffin* rule governed this new attorney's obligations to James and to the court. The new attorney's assignment was to review all of James's potential remaining claims and decide which of them should be litigated. His decision was to litigate none of them. This is "not the type of tactical choice contemplated [by this court in *Tucker* and by the Supreme] Court in *Jones*".[5] Rather, it is the type of decision governed by *Griffin*. The superior court had a duty to ensure that the new attorney provided zealous representation to James. Because the new attorney had had no hand in the prior litigation of the witness recantation issue, and because the new attorney was solely responsible for evaluating James's re-

maining potential claims, it was incumbent on this new attorney to explain to the court why he concluded that James had no further colorable issues to raise.

---

5. *Hertz v. State*, 755 P.2d 406, 410 (Alaska App. 1988) (concurring opinion of Bryner, C.J.).